IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| SHARRON K. YOAKUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-04158-CV-C-REL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sharron Yoakum seeks review of the Commissioner of Social Security's final order denying her application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred (1) by not giving "great weight" to her treating physicians' respective residual functional capacity assessments, (2) in failing to obtain the testimony of a vocational expert, (3) by failing to evaluate the combined effect of her impairments, and (4) in discrediting her subjective complaints of pain. I find that (1) the ALJ properly weighed the opinion of Dr. Griswold and that Dr. Lucio's opinion was consistent with the ALJ's ultimate conclusion, (2) vocational expert testimony was not necessary since Plaintiff did not meet her burden of establishing she could not return to past relevant work, (3) the ALJ did consider the combined effects of Plaintiff's impairments, and (4) the credibility analysis was proper. Therefore, Plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On February 23, 2004, Plaintiff applied for a period of disability and disability insurance

benefits alleging that she had been disabled since April 11, 2003. Her disability stems from sciatic pain, lower back pain, and bilateral knee pain. Plaintiff's application was denied initially. On July 6, 2005, a hearing was held before an ALJ. On December 12, 2005, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On May 17, 2006, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)(citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial

2

evidence standard presupposes a zone of choice within which decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Jernigan, 948 F.2d at 1073 n.5 (quoting Baker v. Heckler, 730 F.2d 1147, 1150-51 (8th Cir. 1984)); Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and can be summarized as follows:

1.      Is the claimant performing substantial gainful activity?

          Yes = not disabled.
          No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

3

No = not disabled.
Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.  THE RECORD

The record consists of Plaintiff's testimony as well as the documentary evidence admitted during the hearing.

### A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## 1.  Earnings Record

Plaintiff's earnings record indicates that she earned the following income from 1970 through 2003:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1970 | $   630.17 | 1987 | $13,369.13 |
| 1971 | 0.00 | 1988 | 15,158.15 |
| 1972 | 1,278.18 | 1989 | 7,560.69 |
| 1973 | 4,287.66 | 1990 | 4,283.85 |
| 1974 | 2,824.97 | 1991 | 12,581.27 |
| 1975 | 1,464.38 | 1992 | 3,515.31 |
| 1976 | 5,200.46 | 1993 | 9,018.82 |
| 1977 | 6,543.74 | 1994 | 11,826.70 |

4

| | | | |
|---|---|---|---|
| 1978 | 3,935.52 | 1995 | 18,575.05 |
| 1979 | 8,714.22 | 1996 | 24,922.45 |
| 1980 | 8,686.35 | 1997 | 32,523.55 |
| 1981 | 5,467.58 | 1998 | 32,480.06 |
| 1982 | 9,719.38 | 1999 | 44,216.25 |
| 1983 | 9,645.35 | 2000 | 33,717.13 |
| 1984 | 10,061.78 | 2001 | 35,447.82 |
| 1985 | 12,077.60 | 2002 | 32,756.40 |
| 1986 | 7,272.28 | 2003 | 16,056.33 |

(Tr. at 56, 61-63).

## 2.    Activities of Daily Living Form

On April 5, 2004, Plaintiff completed a miscellaneous activities of daily living form (Tr. at 93-97).  She stated that her back prevented her from lifting and bending at work (Tr. at 93).  Her back pain was worsened by standing, walking and bending over (Tr. at 93).  Plaintiff reported her prescribed medications bothered her stomach (Tr. at 93).

At home, Plaintiff stated she was able to pay bills, use a checkbook, complete a money order and count change (Tr. at 94).  She also was able to do laundry, do the dishes, make a bed and change the sheets, vacuum/sweep, and do her own banking (Tr. at 95).  Plaintiff reported going shopping once or twice a week for one to two hours at a time (Tr. at 95).  Her hobbies included watching television (Tr. at 96).  Plaintiff stated she had a lot of trouble sleeping and woke up with back, leg or hip pain (Tr. at 95).

Plaintiff's average day included straightening up the house, watching television, cooking supper, and washing and drying clothes (Tr. at 96).  She was able to watch a two-hour movie and read books, magazines and newspapers (Tr. at 96).  Plaintiff drove once a week for approximately forty miles (Tr. at 96).  She stated a doctor advised her not to drive for twenty-four hours after receiving five shots in her back (Tr. at 96).  Plaintiff left her home once or twice a week, often taking

5

her father to the doctor (Tr. at 96).

**3.      Work History Report**

Plaintiff stated she had previously worked at a shoe company, a hat company and as builder (Tr. at 105).  At the shoe company, she sewed shoes using a sewing machine for the first seventeen years; she then cut shoe parts and handled dyes for one year and assembled the shoes her final two years with the company (Tr. at 106).  This job required walking, standing, sitting, and handling small objects (Tr. at 106).  Plaintiff frequently lifted ten pounds; the heaviest weight she ever lifted was twenty pounds (Tr. at 106).

While working at the hat company, Plaintiff sewed hat liners together and sewed bows on the liners and braids on the hats (Tr. at 107).  This job required walking to different machines and sitting while sewing (Tr. at 107).  She was not required to stand, climb, stoop,[1] kneel, crouch, crawl, or handle large or small objects (Tr. at 107).  She frequently lifted less than ten pounds (carrying the hat to the next operation), and never lifted more than that amount (Tr. at 107).  Plaintiff's work as a builder entailed building cabinets and marshalling parts (Tr. at 108).  She was required to walk, stand, sit, climb, kneel, crouch, and handle large and small objects (Tr. at 108).  Plaintiff frequently lifted fifty pounds or more; the heaviest weight she lifted was one hundred pounds or more (Tr. at 108).

**4.      Disability Report**

Plaintiff stated she had some sciatic pain[2] before the accident (Tr. at 113).  The constant pain

---

[1]Stooping was described on the Work History Report as bending down and forward at the waist (Tr. at 107).

[2]"Sciatic pain usually starts in the buttocks and extends down the rear of the thigh and lower leg to the sole of the foot and along the outer side of the lower leg to the top of the foot.  Pain may also be present in the lower back." HealthCentral.com, Sciatic Pain, *at* http://www.healthcentral.com/encyclopedia/408/172.html (last visited Apr. 13, 2007).

6

in her lower back prevents her from doing any lifting, and she is limited in standing and bending (Tr. at 113). Plaintiff's condition first bothered her on April 11, 2003; after that time, she changed her job duties by returning to work as a welder (Tr. at 113-114). She stated she stopped working on November 10, 2003, because she injured in her back in a car accident (Tr. at 114).

Plaintiff's employment history includes doing handlasting at a shoe factory from 1987 until 1992, working as a seamstress at a hat factory from 1992 until 1994, and performing final assembly/marshalling at a transformer factory from 1995 until April of 2003 (Tr. at 114). As a final assembler/marshaller, Plaintiff put transformers together using air and hand tools, inspected completed transformers, ordered parts, put parts in basket(s) prior to assembly, used a forklift to move transformers, and kept production records (Tr. at 114). She walked eight hours, stood eight hours, stooped four hours, crouched two hours, handled large objects eight hours, reached eight hours, and handled small object eight hours (Tr. at 115). She reported frequently lifting fifty-pound transformer parts over her head (Tr. at 115).

### B. SUMMARY OF MEDICAL RECORDS

On February 21, 2003, Plaintiff saw Dr. Scott Griswold and complained of a two-year history of right hip and buttock pain (Tr. at 184). She stated the pain seemed to be worsening, and increased when she laid down at night (Tr. at 184). She had difficulty sleeping due to her inability to find a comfortable position (Tr. at 184). Upon examination, Plaintiff's hip showed full range of motion in the right hip, but there was some discomfort in her knee and sacroiliac[3] joint in the buttocks region

---

[3]The sacroiliac joint is "the joint between the sacrum, at the base of the spine, and the ilium of the pelvis, which are joined by ligaments." Wikipedia, Sacroiliac Joint, *at* http://en.wikipedia.org/wiki/Sacroiliac_joint (last visited Apr. 13, 2007).

7

(Tr. at 184). Dr. Griswold diagnosed Plaintiff with right hip and buttocks pain, questionable sacroiliitis,[4] and prescribed Celebrex[5] 200 mg 1 tablet every day for buttocks discomfort (Tr. at 184).

Lumbar spine magnetic resonance imaging ("MRI") dated March 27, 2003, showed mild bulging at L4-L5 and mild central bulging at L5-S1 with minimal thecal sac[6] effacement (Tr. at 197).

On April 1, 2003, Plaintiff again complained of back and right hip pain (Tr. at 183). Dr. Griswold diagnosed her with degenerative disk disease and possibly sacroiliitis (Tr. at 183). Plaintiff was referred for an epidural steroid injection and prescribed Ditropan XL,[7] 10 mg 1 tablet every day (Tr. at 183).

Plaintiff was involved in a motor vehicle accident on April 10, 2003, after which she complained of low back soreness; the pain was mostly on her right side and right buttocks (Tr. at 216-218). She stated she had experienced similar pain in the past from a work injury and felt it had been reaggravated (Tr. at 216). During examination, Plaintiff was not in distress, but demonstrated mild low back discomfort on the right at S1 and right buttock pain (Tr. at 216). Straight leg raising[8]

---

[4]Sacroiliitis is "an inflammation of the sacroiliac joint." Wikipedia, Sacroiliitis, at http://en.wikipedia.org/wiki/Sacroiliitis (last visited Apr. 13, 2007).

[5]Celebrex is a nonsteroidal anti-inflammatory drug that "works by reducing substances that cause inflammation, pain, and fever in the body." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d04380a1;_ylt=AiAqltM.RMSKXbdtadafgnokD7sF (last visited Apr. 13, 2007).

[6]The thecal sac is a "fluid-filled sac surrounding the spinal cord." See Elliot Krames, Implantable Technologies: Spinal Cord Stimulation and Implantable Drug Delivery Systems, available at http://www.nationalpainfoundation.org/MyTreatment/news_implantabletherapy.asp (last visited Apr. 20, 2007).

[7]Ditropan XL "is used to treat the symptoms of urinary frequency, urinary urgency, urinary leakage, painful or difficult urination, urinary incontinence, and nighttime urination associated with overactive bladder." Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00328a1;_ylt=ApJOkw8Gh8oxCz3qWU814IUkD7sF (last visited Apr. 13, 2007).

[8]"A positive test results in pain in the sciatic nerve distribution and suggests a disc herniation." Mass Medical Services Medical Terminology, Straight leg raising, at http://www.massmed.com/medical_terms.htm (last visited Apr. 13, 2007).

8

was negative and there was no reproducible radiculopathy[9] (Tr. at 216). Plaintiff's muscle strength

was equal and her grip strength was good (Tr. at 216). There were no neurological deficits or

antalgic[10] findings (Tr. at 217). Plaintiff's gait was normal and she was able to flex and extend her

legs (Tr. at 217). Lumbar spine x-rays showed minimal narrowing at L5-S1, but her sacroiliac joints

were intact (Tr. at 218). Plaintiff was diagnosed with low back pain for which she was given an

injection and pain medication to last for the weekend (Tr. at 217). She was further advised to use

heat and rest (Tr. at 217).

Plaintiff saw Dr. Griswold on April 14, 2003 (Tr. at 182). Since the accident, Plaintiff had

experienced a lot of lower- and mid-back pain (Tr. at 182). She had been seen in the emergency

room and was given a muscle relaxant and pain pills (Tr. at 182). Although she was doing better,

she still remained very stiff (Tr. at 182). The accident had not really exacerbated her previous low

back and buttocks pain (Tr. at 182). Physical examination revealed low back spasms throughout the

paraspinal lumbar area[11] (Tr. at 182). Plaintiff had difficulty with flexion[12] and did not extend well;

she also had problems with lateral movement (Tr. at 182). Dr. Griswold diagnosed Plaintiff with

---

[9]"Radiculopathy is a medical term used to describe a 'pinched nerve' in the spine. A radiculopathy occurs when a nerve is irritated by something that is either rubbing on the nerve or pressing on the nerve. In some cases, such as a herniated (or ruptured) disc, there may also be a chemical reaction irritating the nerve. Chemicals released from the inside of the disc seem to irritate nerve tissue, causing pain and inflammation of the nerve." All About Back & Neck Pain, Radiculopathy, *at* http://www.allaboutbackandneckpain.com/html/glosPage1.asp?name=Radiculopathy (last visited Apr. 16, 2007).

[10]Antalgic is a synonym to analgesic, which means "[c]haracterized by reduced response to painful stimuli." STEDMAN'S MEDICAL DICTIONARY 69 (26th ed. 1995).

[11]The lumbar spine is the "lower part of the spine between the thoracic region and the sacrum. The lumbar spine consists of five vertebrae." Back.com, Lumbar, *at* http://www.imgsrv.com/glossary/lumbar.html (last visited Apr. 16, 2007).

[12]"The act of flexing or bending, *e.g.*, bending of a joint so as to approximate the parts it connects; bending of the spine so that the concavity of the curve looks forward." STEDMAN'S MEDICAL DICTIONARY 663 (26th ed. 1995).

9

back strain and instructed her to continue taking Skelaxin[13] 400mg 1-2 tablets every eight hours and to avoid lifting for a week (Tr. at 182).

On April 21, 2003, Plaintiff reported continued back pain (Tr. at 181). She stated the pain had improved slightly but she did not feel she was able to lift (Tr. at 181). Physical examination revealed tenderness to palpation in the paraspinal lumbar area to lower thoracic area[14] (Tr. at 181). She could forward flex a little better and extend better than last week, but remained limited compared to her normal range of motion (Tr. at 181). She was also still tender in the sacroiliac areas, which remained from prior to her accident (Tr. at 181). Plaintiff was diagnosed with back strain and given refills for Vicodin[15] 5/500 mg 1-2 tablets every six hours and Celebrex 200 mg, 1 tablet every day (Tr. at 181).

On April 28, 2003, Dr. Griswold noted that Plaintiff had improved week-to-week (Tr. at 180). She was a little more mobile, but still had significant discomfort in the bilateral paraspinal areas; this pain remained different than the pain she experienced in her sacroiliac joint (Tr. at 180). Plaintiff continued to show mild tenderness to palpation in the bilateral paraspinal areas, although it was "not quite as tight" as it had previously been (Tr. at 180). She could forward flex to 70° and extend to 10°, with some pain in lateral movement (Tr. at 180). Low back sprain was again diagnosed (Tr. at 180). Dr. Griswold instructed Plaintiff to begin physical therapy and continued to

---

[13]Skelaxin is a muscle relaxant. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00964a1;_ylt= At4RstK0rc3HeTllxr57Yz8kD7sF (last visited Apr. 13, 2007).

[14]The thoracic spine is the "chest level region of the spine that is located between the cervical and lumbar vertebrae. It consists of 12 vertebrae which serve as attachment points for ribs." Back.com, Thoracic, *at* http://www. imgsrv.com/glossary/thoracic.html (last visited Apr. 16, 2007).

[15]Vicodin is a narcotic pain reliever. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03428a1; _ylt=AudcRV8iOKGbfw6xlwh8uEQkD7sF (last visited Apr. 13, 2007).

10

limit her from work due to the lifting requirements (Tr. at 180).

On May 5, 2003, Dr. Griswold noted that physical therapy had helped although she was still experiencing a lot of stiffness and pain (Tr. at 179). Plaintiff's flexion was to 70°- 80°, her extension was better and she had good lateral movement; rotation was painful (Tr. at 179). Dr. Griswold diagnosed back strain, resolving (Tr. at 179). Plaintiff was instructed to continue physical therapy (Tr. at 179).

On May 9, 2003, John Lucio, D.O, examined Plaintiff, upon referral from Dr. Griswold (Tr. at 147-48, 213-213A). Plaintiff estimated the severity of her pain to be three or four on a ten-point scale (Tr. at 147, 213). Dr. Lucio noted that she was in no acute distress; examination showed no sacroiliac joint tenderness (Tr. at 147, 213). There was tenderness at L5-S1 and Plaintiff's range of motion was limited in anterior flexion to 60° (Tr. at 148, 213A). Extension and lateral rotation were normal and her muscle strength was "intact" (Tr. at 148, 213A). Patrick's test[16] was negative (Tr. at 148, 213A). Deep tendon reflexes were 2/4 (Tr. at 148, 231A). Dr. Lucio diagnosed chronic back pain with radiation down her right hip secondary to a L4-L5 and L5-S1 disk bulge, and prescribed physical therapy and an epidural steroid injection[17] (Tr. at 148, 213A).

On May 12, 2003, Dr. Griswold noted that Plaintiff's motion was getting better, although she remained a little stiff at times and had difficulty bending (Tr. at 178). Plaintiff had been told in

---

[16]Patrick's, or Faber's, test is used the determine the presence of sacroiliiac disease. See MES Solutions, Patrick's test, *at* http://www.mesgroup.com/glossary/tests.asp (last visited Apr. 16, 2007).

[17]An epidural steroid injection "places a small amount of cortisone into the bony spinal canal. Cortisone is a very strong anti-inflammatory medicine that may control the inflammation surrounding the nerves and may ease pain caused by irritated nerve roots. . . . This injection is often used when other conservative measures do not work, or in an effort to postpone surgery." All About Back & Neck Pain, Epidural Steroid Injection (Nerve Block), *at* http://www. allaboutbackandneckpain.com/html/glosPage1.asp?name=Epidural Steroid Injection (Nerve Block) (last visited Apr. 16, 2007).

physical therapy that she could try lifting ten to fifteen pounds, but nothing heavier (Tr. at 178). She did not have full range of motion, rotation or bending (Tr. at 178). The injection did not provide relief for her sacral discomfort (Tr. at 178). Physical examination revealed Plaintiff was tender to palpation in the lumbar area, but did not have as much spasm (Tr. at 178). Extension and lateral and rotational movements were limited, but forward bending was performed to almost 90° (Tr. at 178).

Plaintiff reported on May 19, 2003, that she had steadily been getting better until the prior day, when she had increasing pain in her lower back (Tr. at 177). She reported difficulty bending and lifting and was very concerned about returning to work where she was required to lift forty to fifty pounds (Tr. at 177). Plaintiff was still tender to palpation in the lumbar area, but there was no significant spasm (Tr. at 177). Dr. Griswold diagnosed low back sprain and continued Plaintiff on her current medications and physical therapy (Tr. at 177).

On May 28, 2003, Dr. Griswold detected only a "slight" spasm in Plaintiff's lumbar area, with tenderness to palpation and reduced range of motion (Tr. at 176). He noted Plaintiff was starting to plateau (Tr. at 176). Plaintiff was slow to stand and had to walk her hands up her legs (Tr. at 176). Dr. Griswold diagnosed back strain with persistent spasm, pain, and decreased range of motion; Plaintiff was instructed to continue physical therapy and her current medications (Tr. at 176).

On May 30, 2003, Plaintiff had normal sensation and muscle strength and tone (Tr. at 212). Anterior flexion was painful and she had tenderness at L5-S1 (Tr. at 212).

Dr. Griswold noted that Plaintiff was feeling better and her pain was diminishing on June 5, 2003 (Tr. at 175). She reported feeling better than she had in a while (Tr. at 175). A slight spasm was noted in the lumbar area; she still had tenderness to palpation throughout, but it was better than

in previous weeks (Tr. at 175). Her range of motion was improving (Tr. at 175). Plaintiff was diagnosed with back strain and instructed to continue taking Celebrex and attending physical therapy (Tr. at 175). Dr. Griswold also recommended Plaintiff not return to work given her difficulty lifting (Tr. at 175).

On June 12, 2003, Dr. Griswold noted some "mild tenderness" to palpation in the paraspinal lumbar area (Tr. at 174). Plaintiff's spasm was "virtually all gone" in her lower back, and she had "good" range of motion in her back (Tr. at 174). Plaintiff continued to do better and show decreasing pain and increasing mobility and strength (Tr. at 174). She was diagnosed with low back strain, resolving (Tr. at 174).

Plaintiff saw Dr. Lucio on June 20, 2003 (Tr. at 145, 211). He noted Plaintiff's sensation, gait and station, stability, and muscle strength/tone were normal (Tr. at 145). Range of motion was painful with anterior flexion (Tr. at 145). Plaintiff had right sacroiliac tenderness (Tr. at 145, 211).

W.B. Rogers, M.D., examined Plaintiff on September 2, 2003 (Tr. at 221-225). Her gait and station were normal; she had some discomfort with back bending, but her back was straight, supple, and symmetric with no scoliosis, shielding, or spasm (Tr. at 222). Her range of motion was "stable," and there were no palpable masses (Tr. at 222). Plaintiff's lower extremities were stable with normal muscle strength and tone and "full" motor power (Tr. at 223). Dr. Rogers reviewed a MRI, which showed a significantly degenerative disk at L5-S1 (Tr. at 223). Plaintiff rated her pain as ranging from a six to an eight on a ten-point scale (Tr. at 225). Current medications included Synthroid,[18] Ditropan, Vicodin, Skelaxin, and Celebrex (Tr. at 221). Dr. Rogers stated that Plaintiff was not

---

[18]Synthroid "is used to treat hypothyroidism." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d00278a1;_ylt=AoIQknc09yf3HOvFKAPUC.wkD7sF (last visited Apr. 13, 2007).

interested in any surgical procedures, a decision which he supported (Tr. at 223).

On November 19, 2003, Plaintiff saw Dr. Griswold for a rash (Tr. at 173). During her appointment, Plaintiff reported she had been able to lift one hundred and ten pounds to knuckle height and sixty pounds overhead during a recent work hardening program (Tr. at 173). She also stated her employer suggested she go on long-term disability (Tr. at 173). Consistent with Plaintiff's report, Dr. Griswold filled out a disability form with restrictions of lifting up to sixty pounds above the head and one hundred and ten pounds knuckle-height (Tr. at 173).

On December 19, 2003, Dr. Lucio noted bilateral sacroiliac tenderness, but normal gait and station (Tr. at 144, 210). Plaintiff's range of motion was painful; anterior flexion was 60° and extension was 10° (Tr. at 144, 210).

Plaintiff followed up with Dr. Lucio on January 9, 2004 (Tr. at 143, 209). Sensation was normal (Tr. at 143, 209). Plaintiff experienced pain with extension and was positive for bilateral sacroiliac tenderness (Tr. at 143, 209).

On February 6, 2004, Plaintiff saw Dr. Lucio again (Tr. at 142, 207). He noted Plaintiff's sensation, gait and station, and muscle strength and tone were normal; she had a full range of motion (Tr. at 142, 207). Her bilateral sacroiliac tenderness had improved (Tr. at 142, 207). Plaintiff was instructed to do water aerobics for six weeks (Tr. at 142, 207).

Osvaldo Acosta-Rodriguez, M.D., examined Plaintiff on April 19, 2004 (Tr. at 162-167). Plaintiff reported a current pain level of eight out of ten (Tr. at 163). She stated the pain awakened her at night and she had difficulty falling asleep due to the pain (Tr. at 163). The pain was made worse by walking, standing, lying on her back with her hips and knees bent, lying on her side, lifting, carrying, bending forward, and vacuuming; rising from a chair and long drives also caused pain (Tr.

14

at 163).

Physical examination revealed Plaintiff was in no apparent distress (Tr. at 163). She could walk on her heels and toes and squat without any obvious weakness or asymmetry (Tr. at 163). There was no obvious muscle wasting throughout her upper or lower extremities (Tr. at 163). Dr. Acosta-Rodriguez noted obvious pain behavior and "exaggerated" moans, groans, and winces in contrast to Plaintiff remaining in uncomfortable positions for "extremely long" periods of time while "most people would have withdrawn" (Tr. at 163). Although she cried several times throughout the examination, Plaintiff denied being in pain (Tr. at 163). There was "a lot of anticipatory pain behavior and withdrawal, but during the actual examination process [Plaintiff] had very little complaints of pain" (Tr. at 163).

Straight leg raising was negative in the sitting and lying down positions; the range of motion in her hip, knee, and ankle were normal (Tr. at 163). There was no significant soft tissue tenderness and a standing sacroiliac joint examination was "completely normal" (Tr. at 163). Plaintiff could dress and undress herself and "easily" maneuver the examination table (Tr. at 164). There were no gross joint deformities, her sensation was intact, and her gross motor function and gait were normal (Tr. at 164). Examination of Plaintiff's left knee did show some mild lateral compartment decreased cartilage and, with a varus[19] strain applied across the medial aspect of the knee, Plaintiff had some motion of the lateral aspect (Tr. at 164). Dr. Acosta-Rodriguez also noted that Plaintiff pointed her toes inward while toe walking, which was "usually seen in patients who want to demonstrate pain behaviors for other than organic causes" (Tr. at 164).

---

[19]"Varus" is defined as "[b]ent or twisted inward toward the midline of the limb or body." STEDMAN'S MEDICAL DICTIONARY 1908 (26th ed. 1995).

MRI results showing mild bulging at L4-L5 and L5-S1 with minimal thecal sac effacement at L5-S1 were also noted (Tr. at 164). Plaintiff was diagnosed with nonradicular back pain and minimal left knee degenerative joint disease without any acute findings for inflamation, effusion or other inflammatory processes (Tr. at 164-165). Dr. Acosta-Rodriguez did not find any evidence of facet or hip disease (Tr. at 164). Plaintiff had a normal right knee examination and a fairly benign lumbar fascia examination (Tr. at 165). Based upon these results, Dr. Acosta-Rodriguez found no significant limitations on Plaintiff's ability to perform work-related activities and opined she could perform sedentary to light medium work on a regular basis (Tr. at 164).

On May 7, 2004, Dr. Lucio noted Plaintiff's gait, station, and muscle strength and tone were all normal, but that she had bilateral sacroiliac tenderness and painful extension (Tr. at 141, 155). Plaintiff was also experiencing tenderness at L5-S1 (Tr. at 141, 155).

Scott Crane filled out a Physical Residual Functional Capacity Assessment on May 11, 2004 (Tr. at 82-89). He opined Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds, stand and/or walk for about six hours in an eight-hour workday, and do unlimited pushing and pulling (Tr. at 83). Plaintiff had occasional limitations stooping, crouching and crawling; she had frequent limitations climbing, balancing and kneeling (Tr. at 84). There were no manipulative, visual, or communicative limitations established (Tr. at 85-86). The only environmental limitation listed was the need to avoid concentrated exposure to vibration (Tr. at 86). Lastly, Mr. Crane noted,

> The claimant states in her [activities of daily living] that walking, standing and bending over make her pain worse. She is mostly dependent in household chores, but does not vacuum or sweep often. She cooks easy meals and is awakened from sleep by back pain. She states when watching movies she needs to get up and move about. The statement's [sic] of the claimant are not totally congruent with the [medical evidence of record] and [are] deemed partially credible.

16

(Tr. at 87).

On July 9, 2004, Dr. Lucio's notes state, "She's been at her best until 8-9 days ago. Now she is at her worst" (Tr. at 140, 154). Plaintiff's sensation, gait and station were normal, extension was painful, and muscle strength and tone were normal; there was no facet tenderness, but bilateral sacroiliac tenderness was noted (Tr. at 140, 154).

Dr. Bradley S. Sloan, D.O., evaluated Plaintiff on August 6, 2004 (Tr. at 161). Plaintiff reported she had right knee pain that had been persistent off-and-on since 1982 when she sustained in injury playing softball (Tr. at 161). The injury had been worse the past several weeks; she reinjured her knee again when bending over to pick up a picture frame (Tr. at 161). Plaintiff injured her left knee in 1999 when she fell off a truck (Tr. at 161). She has also had problems with her back and hip, but denied pain shooting down her legs (Tr. at 161). Plaintiff had some weakness in her legs that worsened with walking (Tr. at 161). She rated her pain as a five on a ten-point scale (Tr. at 161). Current medications included Synthroid, Ditropan, Celebrex, Percocet[20] as needed for pain, a muscle relaxant as needed for spasms, and Legatrin PM[21] (Tr. at 161). Physical examination of Plaintiff's left knee revealed medial and lateral joint line tenderness (Tr. at 161). She had a positive compression test and the pain was worse with flexion (Tr. at 161). McMurray's[22] was positive and

---

[20]Percocet is a narcotic pain reliever. Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d03431a1; _ylt=AjqyGFgTKurzrnNcfdsT14kkD7sF (last visited Apr. 13, 2007).

[21]Legatrin PM is "a pain reliever and a fever reducer." Yahoo!Health, Drug Guide, at http://health.yahoo.com/ drug/d03445a1;_ylt=Aq79oJ0LwdrSq.8Hes8tBB4kD7sF (last visited Apr. 13, 2007).

[22]McMurray's test is performed with the patient lying on his or her back with the knee fully flexed. The examiner "rotates the patient's foot fully outward and the knee is slowly extended; a painful 'click' indicates a tear of the medial meniscus of the knee joint. Inward rotation of the foot with pain indicates a tear in the lateral meniscus." Mass Medical Services Medical Terminology, McMurray's test, at http://www.massmed.com/medical_terms.htm (last visited Apr. 13, 2007).

17

ligament exams were negative (Tr. at 161). Examination of the right knee revealed medial and lateral joint line tenderness that was worse with flexion (Tr. at 161). Ligament exams were negative and a compression test was positive (Tr. at 161). Plaintiff had medial and lateral facet tenderness (Tr. at 161). Squat was difficult at 45° bilaterally (Tr. at 161). In reviewing x-rays of Plaintiff's knees, Dr. Sloan noted degenerative changes and cystic changes in the superior tibia (Tr. at 161). He diagnosed Plaintiff with bilateral knee pain and probable meniscus tears[23] and placed her in a double-hinged brace (Tr. at 161).

Dr. William D. Armstrong read MRIs of Plaintiff's knees on August 9, 2004 (Tr. at 156-157). The MRI of the left knee revealed a (1) tear of the posterior horn of the medial meniscus, (2) degenerative joint disease, (3) some loss of articular cartilage,[24] (4) non-visualization of the anterior cruciate ligament which could represent a tear as there was some thinning of the posterior cruciate ligament also present, (5) bone bruise and contusion along the lateral tibial plateau, and (6) small joint effusion (Tr. at 156). The MRI of the right knee indicated (1) a tear of the posterior horn of the medial meniscus, (2) degenerative change and probable chronic tear of the posterior horn of the lateral meniscus with some loss of articular cartilage present, (3) thinning of the anterior cruciate ligament, (4) small to moderate joint effusion, and (5) mild chondromalacia patella[25] (Tr. at 157).

Plaintiff saw Dr. Sloan on August 13, 2004, for reevaluation of her bilateral knee pain, at

---

[23]Meniscus tears describe "a tear in the shock-absorbing cartilage (meniscus) of the knee." MedlinePlus, Meniscus Tears, at http://www.nlm.nih.gov/medlineplus/ency/article/001071.htm (last visited Apr. 16, 2007).

[24]"[T]he cartilage covering the articular surfaces of the bones participating in a synovial joint." STEDMAN'S MEDICAL DICTIONARY 286 (26th ed. 1995).

[25]"A softening of the articular cartilage of the patella." STEDMAN'S MEDICAL DICTIONARY 332 (26th ed. 1995).

which time her right knee was worse than her left (Tr. at 160). A bilateral knee examination revealed medial and lateral joint line tenderness; she had no note of effusion (Tr. at 160). Ligament exams and Lachman's[26] were unremarkable, but she had positive medial and lateral facet tenderness (Tr. at 160). Plaintiff was diagnosed with bilateral knee degenerative joint disease, bilateral medial meniscus tear, and a right lateral meniscus tear (Tr. at 160). She was given a corticosteroid injection in her right knee and instructed to return in four weeks (Tr. at 160).

On September 8, 2004, Plaintiff saw Dr. Sloan again (Tr. at 159). She requested an injection for her left knee, and Dr. Sloan noted her right knee did well with a corticosteroid injection (Tr. at 159). A bilateral knee examination revealed medial and lateral joint line tenderness; she had no note of effusion (Tr. at 159). A compression test was positive, and ligament exams and Lachman's were unremarkable (Tr. at 159). Plaintiff was diagnosed with bilateral knee degenerative joint disease and a bilateral knee meniscus tear (Tr. at 159). She was given a corticosteroid injection in her left knee and instructed to return in six weeks to decide whether to proceed with arthroscopic intervention (Tr. at 159).

Plaintiff saw Dr. Lucio on January 3, 2005 (Tr. at 139, 153). Straight leg raises were positive on the right at 60° (Tr. at 139, 153). She had bilateral sacroiliac tenderness and positive Faber's[27] (Tr. at 139, 153). Although range of motion was painful with flexion, stability, muscle strength and tone were normal (Tr. at 139, 153).

---

[26]A Lachman test is performed with the patient's knee flexed approximately 20° and the proximal tibia is pulled forward. "Excessive motion of the tibia anteriorly is indicative of a tear of the anterior cruciate ligament. This is found to be the most accurate clinical test for tear of the anterior cruciate ligament." Mass Medical Services Medical Terminology, Lachman test, *at* http://www.massmed.com/medical_terms.htm (last visited Apr. 13, 2007).

[27]See note 16, *supra*.

On January 21, 2005, Dr. Lucio noted Plaintiff had positive straight leg raises on the right at 80° and bilateral sacroiliac tenderness (Tr. at 138, 152). Sensation and gait/station were normal (Tr. at 138, 152). Plaintiff's range of motion was painful with extension (Tr. at 138, 152).

Plaintiff saw Dr. Lucio on March 18, 2005 (Tr. at 137, 151). Straight leg raises were negative, and Plaintiff's gait and station, stability, and muscle strength and tone were normal (Tr. at 137, 151). She experienced bilateral sacroiliac tenderness, midline tenderness at L5-S1 and painful range of motion with anterior flexion at 60° (Tr. at 137, 151).

During an April 18, 2005, follow-up with Dr. Lucio, Plaintiff had positive straight leg raises on the right (Tr. at 136, 150). Sensation was decreased at L5-S1 (Tr. at 136, 150). Examination revealed Plaintiff's gait, station, and muscle strength and tone were normal, although leg extension was painful (Tr. at 136, 150). She had bilateral sacroiliac tenderness, positive Faber's bilaterally, and midline tenderness at L4-S1 (Tr. at 136, 150). Dr. Lucio recommended Plaintiff consider surgery if she did not see an improvement (Tr. at 136).

On June 21, 2005, Dr. Lucio reported positive straight leg raises on the right (Tr. at 135). Plaintiff had decreased sensation at L5-S1 on the right, midline tenderness at L4-S1, and positive Faber's bilaterally (Tr. at 135). She had normal gait and station, normal stability, normal muscle strength and tone, but painful range of motion in her extremities (Tr. at 135). Dr. Lucio refilled Plaintiff's prescription for Hydrocodone[28] and recommended a surgical consultation (Tr. at 135).

Dr. Lucio also completed a Physical Residual Functional Capacity Assessment Form (Tr. at 130-134). He stated Plaintiff's severe back pain radiated down her right leg and that she had a

_____

[28]Hydrocodone is a narcotic pain reliever. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d03361a1;_ylt=Aoig5QKlhQxNtmp7kIOxxbIkD7sF (last visited Apr. 13, 2007).

protruding disc (Tr. at 130). These conditions allowed Plaintiff to walk for one hour, stand two hours, and sit and work for up to five hours (Tr. at 130). She could lift and carry up to twenty pounds occasionally (Tr. at 130). Additionally, Plaintiff could use both hands and feet for repetitive movements (Tr. at 131). She was unable to squat, crawl, climb, reach, stoop, crouch and kneel, but she could occasionally bend (Tr. at 132). Plaintiff could tolerate continuous exposure to noise, frequent exposure to marked temperature changes and dust/fumes/gases, occasionally be around moving machinery and drive automotive equipment, but never be exposed to unprotected heights (Tr. at 132). Dr. Lucio noted Plaintiff had experienced severe pain for two years (Tr. at 133). Objective indicators of pain included reduced range of motion and muscle spasms; subjective indications were complaints of pain and grimaces (Tr. at 133). Finally, Dr. Lucio opined Plaintiff could work with the above limitations (Tr. at 134).

Dr. Griswold filled out a Physical Residual Functional Capacity Assessment Form dated July 5, 2005 (Tr. at 124-128). He opined Plaintiff could work one hour in an eight-hour day; she could sit continuously, but stand and walk only occasionally (Tr. at 124). He noted, "[Plaintiff] cannot stand, bend, walk, or perform vigorous physical activities for more than a few minutes due to hip and lower back pain." (Tr. at 124). Dr. Griswold stated Plaintiff could occasionally lift and carry up to ten pounds, but could never lift more than that amount (Tr. at 124). She could use both her right and left hand for simple grasping and pushing and pulling; she could not use her hands for fine manipulation (Tr. at 125). Similarly, Plaintiff could not use her feet for repetitive movements such as operating foot controls due to her back and hip pain (Tr. at 125). Dr. Griswold opined Plaintiff could occasionally reach and kneel, but could not bend, squat, crawl, climb, stoop, or crouch (Tr. at 126). Moreover, she could continuously be exposed to marked temperature changes,

21

dust/fumes/gasses, and noise, occasionally drive automotive equipment, but never be around moving machinery or be exposed to unprotected heights (Tr. at 126). Dr. Griswold categorized Plaintiff's pain as intermittent severe pain that resulted from activity (Tr. at 126-127). Objective indicators of pain included reduced range of motion in her back, muscle spasms, and sensory disruption in her knees; subjective indicators included complaints of pain, sleeplessness, irritably, and grimaces (Tr. at 127). He noted activities related to the back and/or legs incited Plaintiff's pain, while rest relieved the pain (Tr. at 128). Plaintiff had been prescribed Hydrocodone and had also undergone physical therapy, a work hardening program, attended a pain clinic, and performed water aerobics (Tr. at 128).

On July 22, 2005, Dr. Lucio found Plaintiff's straight leg raises were positive on the right at 60° (Tr. at 122). Sensation was decreased on the right at L5-S1; there was midline tenderness at L4-S1 and range of motion was painful in her extremities (Tr. at 122).

Plaintiff saw Dr. Hough on August 19, 2005, for a follow-up on her lower back pain (Tr. at 226-227). She reported the pain was worst in her left buttock (Tr. at 226). The pain had improved approximately ten percent for one or two weeks after her last visit but had returned (Tr. at 226). Plaintiff's pain was located in her low back and radiated down her left leg to the knee; it was exacerbated by bending over doing laundry (Tr. at 226). She rated her pain as a seven on a ten-point scale (Tr. at 226). Physical examination of Plaintiff's lumbar spine revealed tenderness to palpation midline L5-S1 and at the left paravertebral tissue (Tr. at 226). Range of motion with flexion, extension and side bending was painful (Tr. at 226). Straight leg raises were 50°- 60° on the right (Tr. at 226). Plaintiff had decreased sensation at L5-S1 on the right (Tr. at 226). She was diagnosed with low back pain with right radiculopathy (Tr. at 227). Dr. Hough continued Plaintiff on her prescribed pain medications and increased her Vicodin dose to 7.5/500 one to two tablets three times

Case 2:06-cv-04158-REL   Document 19   Filed 04/27/07   Page 22 of 39

daily as needed for pain (Tr. at 227).

Lumbar spine CT scan results from September 12, 2005, showed a small central protrusion at L5-S1 and mild central bulge at L4-L5, with moderate left lateral recess narrowing (Tr. at 228). These results indicated Plaintiff had (1) L5-S1 10/10 concordant pain,[29] though without lateralization and (2) L4-5 9/10 inconcordant pain, lateralizing to the left (Tr. at 228).

### C.  SUMMARY OF TESTIMONY

The hearing consists solely of Plaintiff's testimony.  Plaintiff testified that she completed twelfth grade and did not receive any specialized training elsewhere (Tr. at 236).  She is married with no minor children at home (Tr. at 236-237).  Her last employer was ABB in Jefferson City, Missouri (Tr. at 238-239).  There, Plaintiff worked as a final builder and marshaller, filling boxes for the cabinet area and for the final builders (Tr. at 238).  She stated she stopped working in April of 2003 due to problems with pain in her lower back (Tr. at 239).

Plaintiff described her back as her most serious problem (Tr. at 239).  She reported having two bulging discs, chronic lower right extremity radiculitus and arthritis (Tr. at 239).  She also testified to having "aching and real bad hurting pain" in her hip and lower back on both sides that ran down her right knee (Tr. at 239-240).  The pain in her lower back and legs was constant and walking or sitting tended to make it worse (Tr. at 241).  She moves around every forty-five minutes, takes medication, and changes positions to try to alleviate the pain (Tr. at 241).

Plaintiff testified she had trouble sleeping some nights due to the pain in her back and legs (Tr. at 242).  She takes Legatrin and pain pills every night, but is still up and down two or three times (Tr. at 242, 243).  Sometimes Plaintiff gets up and rocks in order to relieve the pain or to make

---

[29]Concordant pain is that which corresponds to a patient's usual pain.

23

herself sleepy (Tr. at 243). She has also tried placing a pillow between her legs but that has been unsuccessful in relieving the pain (Tr. at 243). Plaintiff's husband no longer sleeps in the same bed because he gets tired of hearing her groan and move around; this has, consequently, affected their private life (Tr. at 243-244).

Plaintiff has been seeing Dr. Lucio for pain management since May of 2003 (Tr. at 245). Dr. Lucio told her surgery on her back or legs would make the condition(s) worse (Tr. at 244). Plaintiff has had twelve epidural shots which only relieved her pain for two or three months (Tr. at 244). She has attended therapy at Eldon Capital Region and Capital Region in Jefferson City, Missouri (Tr. at 245). Plaintiff also went to water aerobics at Capital Regional without benefit (Tr. at 246). She reported the work hardening therapy made her symptoms worse (Tr. at 246).

With regard to her knees, Plaintiff testified she had torn ligaments on both the outside and inside of her right knee, and on the inside of her left knee (Tr. at 246). She has been told by a doctor that she blew out the cartilage in her left knee (Tr. at 246). Plaintiff has had surgery on her left knee that was not beneficial; in fact, she believes the surgery made her knee worse since she can no longer squat or get down without crawling or climbing on something (Tr. at 246). After knee surgery, Plaintiff was off work for eight to ten weeks (Tr. at 247). When she returned, she did not perform well due to difficulty squatting and stooping (Tr. at 247). She was transferred to another position that required use of the upper body and lifting, but still could not perform her duties due to her back (Tr. at 248).

Plaintiff testified the pain in her right knee was constant (Tr. at 248). She has arthritis in her knee and has received a shot of cortisone or a steroid, which helped for one or two months (Tr. at 248-249). Cool air aggravates the pain and the pain remains constant even though she does not work

24

(Tr. at 249). Plaintiff rated the pain in both knees as a seven to a nine out of ten, with ten being the most severe (Tr. at 250). The pain in her left knee is constant, but greater on the inside (Tr. at 250). Plaintiff rated her back pain as an eight to nine on a ten-point scale, and described it as "off and on" with more bad days than good (Tr. at 250). She takes pain medication and experiences side effects including an upset stomach, coughing, and an inability to fall asleep (Tr. at 250). Her husband believes the medications affect her character and make her act "kind of stupid or crazy" (Tr. at 259).

Plaintiff reported having bunions on both feet (Tr. at 251). The bunion on her right foot is located on the top of her foot, below the big toe (Tr. at 251). It hurts on the side when she walks and she sometimes also has pain on the bottom of her foot (Tr. at 251). The bunion on her left foot is slightly larger than the one on her right foot and is located in the same general area (Tr. at 251). She hopes to have the bunions repaired (Tr. at 251).

Plaintiff further testified that she suffered from arthritis and believed it caused her knees and back to hurt (Tr. at 252). She stated she has high cholesterol and has been trying to watch what she eats (Tr. at 252). Because her insomnia prevents her from sleeping at night, she tries to stay awake during the day so she will be tired at night (Tr. at 252-253). Plaintiff also has problems with her bladder (Tr. at 253). She wears liners and pads during the day and changes them every half hour as needed (Tr. at 253). Lastly, Plaintiff suffered hearing loss from noise at previous jobs (Tr. at 260-261). She explained that she has trouble hearing the television as the words run together; she also expressed difficulty hearing the ALJ during the hearing (Tr. at 236, 260-261).

Plaintiff's typical day does not include many activities except for possibly reading (Tr. at 253). She testified she spends a lot of time using the restroom (Tr. at 253). Her husband and older son do the household chores (Tr. at 253). Plaintiff vacuums once a month (Tr. at 254). When she

Case 2:06-cv-04158-REL   Document 19   Filed 04/27/07   Page 25 of 39

was younger and her children lived at home, she cooked all the time; now she only cooks supper and does not bake (Tr. at 254).  She used to attend church on Sunday mornings all the time but now only attends ten to fifteen times a year (Tr. at 255-256).  Plaintiff cannot sit through an entire service without getting up to use the restroom (Tr. at 256).  She drives a car once a week for approximately twenty minutes (Tr. at 257).  She does most of the grocery shopping with her mother's help (Tr. at 257-258)

Plaintiff testified she has trouble dressing herself (Tr. at 258).  Bending over to put on her pants causes her lower back to ache (Tr. at 258).  She can sit comfortably for about fifteen to twenty minutes and stand for fifteen to thirty minutes before needing to sit down (Tr. at 258-259).  Plaintiff stated she did not have any trouble reaching over her head or side to side (Tr. at 259).  She cannot bend at the waist or touch her knees due to the pain in her lower back (Tr. at 259).  Plaintiff reported being able to comfortably lift and carry five to ten pounds across a room; additional weight, however, causes back pain (Tr. at 259-260).  She does exercises on a daily basis as recommended by her doctor (Tr. at 264).

Plaintiff was employed as a seamstress at a shoe factory for seventeen years; she also cut parts, handlasted shoes, pulled, and hammered for three additional years (Tr. at 261).  Sewing was a sedentary job, consisting of sitting approximately five to six hours a day (Tr. at 262).  She lifted baskets that weighed anywhere from ten to twenty-three pounds (Tr. at 261-263).  When Plaintiff cut parts and handlasted, she was required to stand (Tr. at 263).  Plaintiff's job at the hat factory allowed her to either sit or stand and required she lift ten to twenty pounds (Tr. at 263-264).

### D.  FINDINGS OF THE ALJ

On December 12, 2005, the ALJ issued an opinion finding that Plaintiff was not disabled at

26

step four of the sequential analysis.

According to step one, the ALJ found that Plaintiff had not worked since her alleged onset date, April 11, 2003 (Tr. at 15, 26). He next found that Plaintiff had a "mildly bulged disc at L4-5 and a mildly bulged disc at L5-S1 with 'minimal' thecal sac effacement, . . . [and] a history of tears of the posterior horns of the medial menisci in the knees with degenerative changes" that constituted a medically determinable, severe impairment (Tr. at 16, 26). At step three of the analysis, the ALJ found that Plaintiff's impairment, or combination of impairments, did not meet or equal a listed impairment (Tr. at 16, 26).

Ultimately, however, the ALJ found that Plaintiff's impairments did not prevent her from performing past relevant work (Tr. at 25, 26). In doing so, the ALJ specifically discredited Plaintiff's description of her symptoms and limitation of function and gave little weight to the residual functional capacity assessments of Drs. Lucio and Griswold (Tr. at 25). The ALJ found that Plaintiff's residual functional capacity did not preclude performance of her past relevant work as a hat factory worker as she described and performed it (Tr. at 25, 26).

### V. WEIGHT AFFORDED TO OPINIONS OF TREATING PHYSICIANS

Plaintiff argues that the ALJ erred by failing to give the opinions of Drs. Griswold, Lucio and Rogers[30] great weight and, instead, affording the opinion of consulting physician Dr. Acosta-Rodriguez too much weight. As noted by the ALJ and the parties in their respective briefs, the opinion of a treating physician is ordinarily given more weight than that of a consulting physician. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986). To be entitled to this controlling weight,

---

[30]The record reveals Plaintiff only saw Dr. Rogers one time, on September 2, 2003 (Tr. at 221-225), and that he did not complete a residual functional capacity assessment.

27

however, treating physicians' opinions cannot be "inconsistent with other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)(quoting 20 C.F.R. § 404.1527(d)(2)).

In this case, the ALJ properly gave Dr. Griswold's ultimate opinion, as contained in his residual functional capacity assessment, less weight since it was inconsistent with his treatment notes. Specifically, Dr. Griswold opined that Plaintiff could stand, walk and work one hour in an eight-hour day, and sit for eight hours. He noted, "[Plaintiff] cannot stand, bend, walk, or perform vigorous physical activities for more than a few minutes due to hip and lower back pain." Dr. Griswold further stated Plaintiff could occasionally lift and carry up to ten pounds, but could never lift more than that amount; she could use both her right and left hand for simple grasping and pushing and pulling, but could not use them for fine manipulation. Additionally, Plaintiff could not use her feet for repetitive movements such as operating foot controls due to her back and hip pain. Dr. Griswold opined Plaintiff could occasionally reach and kneel, but could not bend, squat, crawl, climb, stoop, and crouch.

Dr. Griswold's treatment notes, however, do not contain such limiting restrictions that support his opinion that Plaintiff could only work one hour a day. Dr. Griswold consistently diagnosed Plaintiff with a back strain/sprain (Tr. at 174, 175, 176, 177, 179, 180, 181, 182). He even stated on May 5, 2003, and June 12, 2003, that such pain was "resolving" (Tr. at 174, 179). Although Plaintiff initially had spasms in her lower back (Tr. at 182), Dr. Griswold noted they were "virtually all gone" by June 12, 2003 (Tr. at 174). The only work restriction Dr. Griswold ever placed on Plaintiff was to avoid lifting (Tr. at 173, 175, 180). However, he completed a disability report dated November 19, 2003, stating that Plaintiff could lift up to sixty pounds over her head and

28

up to one hundred and ten pounds knuckle-height (Tr. at 173). He never noted any limitations on using her hands for fine manipulation or on foot movement. The medical evidence of record indicates that, when Dr. Griswold completed the residual functional capacity assessment on July 5, 2005, he had not seen Plaintiff for complaints of back pain since on June 12, 2003. Dr. Griswold's residual functional capacity assessment was thus not entitled to great weight.

The ALJ also gave Dr. Lucio's opinion, as contained in his June 21, 2005, residual functional capacity assessment, less weight because his "treatment notes basically consist of the claimant's subjective portrayals of pain and tenderness which are unsupported by the remainder of the record for the reasons noted above." (Tr. at 25). I disagree.

Plaintiff began receiving treatment from Dr. Lucio on May 9, 2003 (Tr. at 147-148, 213-213A). At this time, she was also still receiving treatment from Dr. Griswold (<u>See</u> Tr. at 173, 174, 175, 176, 177, 178, 179). During this time, Dr. Lucio's treatment notes are largely consistent with those of Dr. Griswold, in that they reflect Plaintiff was improving. They are also consistent with Dr. Acosta-Rodriguez's April 19, 2004, assessment. Although Dr. Lucio's treatment notes did indicate Plaintiff's range of motion was painful (Tr. at 141, 143, 144, 145, 148, 155, 209, 210, 213), such complaints were not supported by objective test results. On February 6, 2004, Plaintiff even had a full range of motion (Tr. at 142, 207).

Beginning on January 3, 2005, however, Dr. Lucio's treatment notes start to contain objective findings that support his ultimate opinion (Tr. at 135-139, 150-153). Straight leg raises were positive on January 3, 2005, January 21, 2005, April 18, 2005, and June 21, 2005 (Tr. at 135, 136, 138, 139, 150, 152, 153). Plaintiff had positive Faber's bilaterally on January 3, 2005, April 18, 2005, and June 21, 2005 (Tr. at 135, 136, 139, 150,153). Plaintiff was not receiving treatment for her back pain

from other doctors during this time frame. Treatment subsequent to the date of Dr. Lucio's residual functional capacity report continues to reflect Plaintiff had positive straight leg raises (Tr. at 122, 226). Dr. Hough also increased her dosage of Vicodin on August 19, 2005 (Tr. at 227).

Despite these findings, Dr. Lucio still opined that Plaintiff could walk for one hour, stand two hours, sit and work for five hours, and lift and carry up to twenty pounds occasionally. He also stated Plaintiff was unable to squat, crawl, climb, reach, stoop, crouch and kneel, but could use her hands and feet for repetitive movements and occasionally bend. Importantly, he did not find any medical reasons that would prevent Plaintiff from working within the above-listed limitations.

Using the limitations described by Dr. Lucio, and even with the more restrictive limitations described by Dr. Griswold, Plaintiff could perform her past relevant work as a seamstress in a hat factory. As Plaintiff described this position in her work history report, she was only required to sit and walk between different machines; she did not need to stand, climb, stoop, kneel, crouch, crawl, or handle large or small objects (Tr. at 107). It therefore is not relevant whether Plaintiff has a full range of motion, is limited in flexion and/or extension, has straight leg raises, or positive Faber's. Likewise, Drs. Griswold and Lucio both opined Plaintiff could occasionally lift at least up to ten pounds,[31] an amount that would easily encompass carrying hat(s) between stations. Plaintiff's motion for summary judgment is denied on this basis.

### VI. LACK OF TESTIMONY FROM VOCATIONAL EXPERT

Plaintiff next argues that the ALJ's failure to obtain the testimony of a vocational expert

_____

[31]Plaintiff also testified at the hearing that she could comfortably lift and carry five to ten pounds across the room without developing back pain (Tr. at 259-260).

constitutes reversible error. Under the five-step analysis, a plaintiff must first establish, *inter alia*, that she is unable to return to past relevant work; only then is the burden of persuasion shifted to the Commissioner to establish there is some other type of substantial gainful activity in the national economy the plaintiff can perform. Griffon, 856 F.3d at 1153-54. If the ALJ determines the plaintiff is not disabled due to an ability to perform past relevant work, the testimony of a vocational expert is not necessary. Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996); Johnston v. Shalala, 42 F.3d 448, 452 (8th Cir. 1994); Brunston v. Shalala, 945 F. Supp. 198, 202 (W.D. Mo. 1996). Here, the ALJ determined Plaintiff retained the residual functional capacity to perform her past relevant work as a seamstress in a hat factory, so the testimony of a vocational expert was not necessary. Plaintiff's motion for summary judgment is, accordingly, denied on this ground.

## VII.   COMBINED EFFECT OF IMPAIRMENTS

An ALJ is required to consider the combined effect of all of the plaintiff's impairments in making a disability determination. 20 C.F.R. § 404.1523. "Sufficient consideration of the combined effects of a plaintiff's impairments is shown when each is discussed in the ALJ's decision, including discussion of the plaintiff's complaints of pain and level of daily activities." Smith v. Chater, 959 F. Supp. 1142, 1147 (W.D. Mo. 1997); see also Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). "'To require a more elaborate articulation of the ALJ's thought process would not be reasonable.'" Id. (quoting Gooch v. Secretary of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987)); see also Browning, 958 F.2d at 821.

Plaintiff maintains that the ALJ erred here by failing to fully evaluate the combined effects of her "bilateral knee degenerative joint disease, bilateral knee meniscus tears, right

31

lateral meniscus tear, bilateral knee pain, and hip and back pain from the degenerative disc disease" (Doc. No. 9, at 13). I disagree. The ALJ specifically found Plaintiff had "a mildly bulged disc at L4-5 and a mildly bulged disc at L5-S1 with 'minimal' thecal sac effacement, . . . [and] a history of tear of the posterior horns of the medial menisci in the knees with degenerative changes" (Tr. at 16, 26). In his decision, the ALJ discussed Plaintiff's bilateral knee pain (Tr. at 17-18), and found she "failed to meet her burden of establishing that her knee complaints resulted in a severe impairment meeting the durational requirement" (Tr. at 18). The ALJ also discussed Plaintiff's hip and back pain at length and her activities of daily living (Tr. at 18-23, 24-25). Nothing more is required. Plaintiff's motion for summary judgment is denied.

## VIII. CREDIBILITY OF PLAINTIFF

Lastly, Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson,

Case 2:06-cv-04158-REL   Document 19   Filed 04/27/07   Page 32 of 39

956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including the plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as the plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski, 739 F.2d at 1322. Each factor will be addressed in turn.

## 1. PRIOR WORK RECORD

Plaintiff's earnings demonstrate that she had a good work record up to and including her alleged onset of disability. Her highest annual earnings occurred in 1999 when she made $44,216.25. Her average annual earnings for the thirty-three years she worked is $13,509.65. This factor does not support the ALJ's credibility determination.

## 2. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff maintains that the pain in her lower back is constant (Tr. at 113, 241). She alternatively described the pain as "off and on" with more bad days than good (Tr. at 250). Regardless of the exact frequency, Plaintiff's treatment history is not indicative of an individual in a great deal of pain all the time. A review of her medical records reveals Plaintiff gave conflicting pain assessments close in time, that her complaints were inconsistent with objective medical findings, and that she did not seek treatment for months at times when she claimed to be experiencing the most pain.

33

For instance, Plaintiff has alleged she could not work after April 11, 2003, due to disabling back pain. By June 12, 2003, however, Dr. Griswold indicated Plaintiff had improved. He detected only "mild tenderness" to palpation in the paraspinal lumbar area, observed the spasm in Plaintiff's lower back was "virtually all gone," and noted she had "good" range of motion in her back; overall, Plaintiff was continuing to do better and showed decreasing pain and increasing mobility and strength (Tr. at 174). Besides a June 20, 2003, appointment with Dr. Lucio, which was not significant, Plaintiff was not seen by any other medical professional from this date until September 2, 2003, when she told Dr. Rogers her pain ranged from a six to an eight on a ten-point scale. This assessment is at odds with her records from this same time period and there is no indication of a precipitating event that caused her condition to worsen.

Plaintiff did not again seek treatment for her back pain until December 19, 2003 (Tr. at 144, 210). In fact, when she saw Dr. Griswold for a rash on November 19, 2003, she did not complain of back pain and even reported lifting sixty pounds overhead and one hundred and ten pounds to knuckle height (Tr. at 173). Plaintiff saw Dr. Lucio for back pain again on January 9, 2004, and February 6, 2004, and – as noted at the February appointment – her bilateral sacroiliac tenderness had improved and she demonstrated normal sensation, gait and station, muscle strength and tone; she also had a full range of motion (Tr. at 142, 207).

When Plaintiff was examined by Dr. Acosta-Rodriguez on April 29, 2004, she assessed her pain level as an eight out of ten (Tr. at 163). She stated the pain awakened her at night and that she had difficulty falling asleep (Tr. at 163). Walking, standing, lying on her back with her hips and knees bent, lying on her side, lifting, carrying, bending forward, vacuuming, rising from a chair, and long drives reportedly made her pain worse (Tr. at 163). By contrast, physical

34

examination revealed she was not in such extreme pain; Plaintiff's straight leg raises were negative, she had a normal range of motion and a "completely normal" standing sacroiliac joint examination (Tr. at 163).

Following this examination, Plaintiff sought treatment on May 7, 2004, and July 9, 2004 (Tr. at 140-141, 154-155). On July 9, 2004, Dr. Lucio detected bilateral sacroiliac tenderness and noted that Plaintiff had "been at her best until 8-9 days ago. Now she is at her worst." (Tr. at 140, 154). Despite this apparent worsening of her condition, Plaintiff did not seek treatment for back pain again until January 3, 2005 – nearly six months later (Tr. at 139, 153). These inconsistencies as a whole suggest Plaintiff's subjective complaints of back pain are not credible and constitute substantial evidence supporting the ALJ's credibility determination.

Similarly, Plaintiff testified at the hearing that the pain in her legs was also constant (Tr. at 241, 248). She rated the pain in both knees as a seven to a nine out of ten (Tr. at 250). As with her allegations of back pain, Plaintiff's medical records do not demonstrate constant leg pain. The medical evidence of record reveals Plaintiff first sought treatment for knee pain on August 6, 2004 (Tr. at 161). Plaintiff told Dr. Sloan she had pain in her right knee that had been persistent off-and-on since 1982; she had injured her knee in 1999 (Tr. at 161). As observed by the ALJ, it is noteworthy that Plaintiff continued to be able to work with this pain up until April 11, 2003. Plaintiff only saw Dr. Sloan again on August 13, 2004, and September 8, 2004, at which time her knee pain seemed to be controlled by the corticosteroid injection (Tr. at 159, 160).

Despite telling Dr. Sloan that her back pain did not radiate down her legs (Tr. at 161), she testified at the hearing that her lower back pain did run down her right knee (Tr. at 239-240).

35

This factor weights in favor of the ALJ's decision to discredit Plaintiff's subjective complaints.

## 3. DAILY ACTIVITIES

Plaintiff's daily living are not consistent with an individual in constant pain. Plaintiff stated in a daily living form that she was able to pay bills, use a checkbook, complete a money order and count change (Tr. at 94). She also was able to do laundry, do the dishes, make a bed and change the sheets, vacuum/sweep, and do her own banking (Tr. at 95). Plaintiff reported going shopping once or twice a week for one to two hours at a time (Tr. at 95). Her average day included straightening up the house, watching television, cooking supper, and washing and drying clothes (Tr. at 96). She was able to watch a two-hour movie and read books, magazines and newspapers (Tr. at 96). Plaintiff left her home once or twice a week, often taking her father to the doctor (Tr. at 96). She drove once a week for approximately forty miles (Tr. at 96).

Plaintiff testified that she had trouble dressing herself and that bending over to put on her pants also caused her lower back to ache (Tr. at 258). Dr. Rodriguez observed, however, Plaintiff could dress and undress herself and "easily" maneuver the examination table (Tr. at 164). This factor support's the ALJ's determination.

## 4. PRECIPITATING AND AGGRAVATING FACTORS

Plaintiff testified that walking, sitting and cool air tended to make her hip and lower back pain worse (Tr. at 241, 249). She reported in a daily living form that standing, walking and bending over made her back pain worse (Tr. at 93). On April 19, 2004, Plaintiff told Dr. Rodriguez the pain was aggravated by walking, standing, lying on her back with her hips and knees bent, lying on her side, lifting, carrying, bending forward, vacuuming, rising from a chair, and long drives (Tr. at 163). She also stated her back pain was exacerbated by bending over

36

doing laundry (Tr. at 226).

These allegations conflict with the objective medical evidence. Plaintiff's doctors only restricted her from lifting; they never stated she should not stand, walk or bend. The allegations are also inconsistent with Plaintiff's activities of daily living, as she stated she did laundry, did the dishes, made beds and changed the sheets, vacuumed, shopped, prepared supper, and drove approximately forty miles each week. This factor supports the ALJ's decision to discredit Plaintiff's subjective complaints.

## 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The evidence of record contains very little mention of the efficacy or side effects of Plaintiff's medications. The medical records do reflect that Plaintiff was continued on her pain medications at the same levels, except Dr. Hough increasing her dosage of Vicodin in August of 2005 (See Tr. at 227), which suggests they were producing the desired effect. On September 8, 2004, Plaintiff reported that her right knee did well with a corticosteroid injection and requested the same for her left knee (Tr. at 159).

Plaintiff stated in an April 5, 2004, daily living form that her prescribed medications bothered her stomach (Tr. at 93). She also testified at the hearing that the medications caused her to have an upset stomach, cough, and to be unable to fall asleep (Tr. at 250). Her medical records to not indicate she ever reported these symptoms to any of her treating physicians or sought to remedy the alleged effects. This factor supports the ALJ's credibility determination.

## 6. FUNCTIONAL RESTRICTIONS

On May 12, 2003, Plaintiff informed Dr. Lucio that she had been told in physical therapy to avoid lifting more than ten to fifteen pounds (Tr. at 178). Dr. Griswold recommended on June

5, 2003, that Plaintiff not return to work given her difficulty lifting (Tr. at 175). On November 19, 2003, however, Dr. Griswold filled out a disability form with restrictions of lifting up to sixty pounds above her head and one hundred and ten pounds knuckle-height (Tr. at 173). Plaintiff was never restricted from doing anything other than lifting. This factor weighs in favor of the ALJ's decision to discredit Plaintiff's subjective complaints.

## B. CREDIBILITY CONCLUSION

In addition, the comments Dr. Acosta-Rodriguez made during the course of his examination are not favorable to Plaintiff's credibility. Dr. Acosta-Rodriguez observed Plaintiff exhibited obvious pain behavior and "exaggerated" moans, groans, and winces (Tr. at 163). She also remained in uncomfortable positions for "extremely long" periods of time when "most people would have withdrawn" (Tr. at 163). He stated she demonstrated "a lot of anticipatory pain behavior and withdrawal, but during the actual examination process . . . had very little complaints of pain." (Tr. at 163). Finally, he noted Plaintiff pointed her toes inward while toe walking, which was "usually seen in patients who want to demonstrate pain behaviors for other than organic causes" (Tr. at 164). For all the reasons discussed above, I find that the record contains substantial evidence supporting the ALJ's finding that Plaintiff's subjective complaints were not credible. Plaintiff's motion for summary judgment on this basis is, therefore, denied.

## IX. CONCLUSIONS

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

38

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 26, 2007

Case 2:06-cv-04158-REL   Document 19   Filed 04/27/07   Page 39 of 39